JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TOYOTA TSUSHO AMERICA, INC., | Case No. SACV13-1077 AG(ANx) |
| Plaintiff, | JUDGMENT ON ARBITRATION AWARD |
| v. | (9 U.S.C. § 13) |
| SINO SCRAP, INC., a California Corporation; SCOTT VOLLERO, an individual; DENNIS MCELROY, an individual; ARTHUR SIMPSON, an individual; and JOHN R. MION, an individual, | Complaint Filed: July 18, 2013<br>Trial Date:          May 3, 2016 |
| Defendants. | |

**TroyGould**
**PC**

03383-0002  272832.2

1   Pursuant to the Court's September 3, 2015 Order Confirming Arbitration
2   Award in this matter, IT IS HEREBY ADJUDGED AND ORDERED that:

3       1.      The Final Award in the arbitration entitled <u>In the Matter of The</u>
4   <u>Arbitration Between Toyota Tsusho America and Scott Vollero, Respondent and</u>
5   <u>Related Cross-Action</u>, ICDR Case No. 50-20-1300-1142, dated August 4, 2015 on
6   (the "Final Award") is entered as a Judgment of the Court;

7       2.      A true and correct copy of the Final Award is attached hereto as Exhibit
8   A.

9   September 03, 2015

10

11                                          _____
12                                          Honorable Andrew J. Guilford
                                            United States District Court Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TroyGould**
**PC**

1

03383-0002  272832.2

## International Centre for Dispute Resolution

### In the Matter of the Arbitration Between:

| | |
|---|---|
| Toyota Tsusho America, Inc., Claimant | ICDR Case No. 50-20-1300-1142 |
| and | |
| Scott Vollero, Respondent | **FINAL AWARD** |
| and Related Cross-Action | |

---

# INTRODUCTION

---

**A Note on Counsel**
The Panel is unanimous in conveying its appreciation to all counsel for their professionalism, courtesy and their efficiency.

---

## I
## PRELIMINARY MATTERS

**A. Parties and Counsel:** The parties to this arbitration are identified in the caption and on the attached Service List.

**B. Arbitrators:** (The arbitrators, or a majority of them, are referred to herein as "The Arbitrators" or "the Panel"):

| | | |
|---|---|---|
| **Hon. Dickran Tevrizian** (Ret.) | **Hon. Patricia Collins** (Ret.) | **Hon. Eric E. Younger** (Ret.) |
| JAMS | ADR Services, Inc. | ADR Services, Inc. |
| 555 W. Fifth Street, | 915 Wilshire Blvd. | 915 Wilshire Blvd. |
| 32nd floor, | Suite 1900 | Suite 1900 |
| Los Angeles, CA 90013 | Los Angeles, CA 90017 | Los Angeles, CA 90017 |
| 213-253-9732 (telephone) | 213-683-1600 | 213-683-1600 |
| dtevrizian@jamsadr.com | judgecollins@adrservices.org | eric@theyoungers.net |

**C. Agreement to Arbitrate:** The arbitration clause in case no. 50-20-1300-1142, between Toyota Tsusho America, Inc. and Scott Vollero is contained in the Shareholders' Agreement dated May

16, 2011. The arbitration was ordered on November 7, 2013, pursuant to the Federal Arbitration Act ("FAA"), by the United States District Court for the Central District of California Case No. SACV 13-1077AG ("Order"). The Order referred the former case to Arbitration.

A related matter, ICDR Case No. 72-20-1300-1067, between ELV Components Recycling and Scott Vollero, *et al.*, is subject to an arbitration clause contained in the Assets Purchase Agreement dated May 16, 2011 between those parties. While the instant case and that case, in which Hon. Eric E. Younger is the sole Arbitrator, have been consolidated for certain purposes, including discovery and some briefing and testimony, the latter case (No. 72-20-1300-1067) will be resolved after the completion of this matter.

**D. Pleadings and Arbitrability:** The claims in case no. 50-20-1300-1142 were originally stated in the Demand for Arbitration dated November 26, 2013 filed by Claimant, Toyota Tsusho America, Inc., but those claims were limited (see below) in its February 23, 2015 Pre-Trial Memorandum of Law. The Answer and Counterclaims of Respondent and Cross-Claimant, Scott Vollero, the Answer of Cross-Respondent ELV Components Recycling, Inc.; and the Answer of Cross-Respondent, Toyota Tsusho America, Inc. round out the pleadings. All the existing claims are arbitrable.

**E. Applicable Law and Rules:** As to claims 1 and 2, federal substantive law applies. As to the remaining (fraud) claim, the substantive law of California applies. The applicable Commercial Arbitration Rules of the American Arbitration Association also apply to the entire case.

**F. Place of Arbitration**: Los Angeles, California.

**G. Dates of Arbitration Hearing**: March 2 through 12, 2015

**H. Reported by:** Michelle Milan Fulmer, CSR 6942, RPR, CRR and Janet M. Taylor, CSR 9463, RMR CRR

**I. Bifurcation:** The parties agreed to bifurcate the issues of any award of attorneys' fees and costs

2

to the prevailing party pursuant to the Shareholders' Agreement section 9.08 (Arbitration) and Section 9.09 (Legal Fees).

**J. Punitive Damages Prohibited:** Pursuant to Section 9.08, an award of punitive damages is not permissible in this Arbitration Proceeding.

**K. Neutral Arbitrators:** All Arbitrators served as neutrals.

## II
## OVERVIEW of the FACTS of the CASE

### A. Catalytic Converters, PGMs and the Early TAI-Vollero Relationship

A catalytic converter is an emission control device on an automobile that uses certain Platinum Group Metals ("PGMs"—mainly platinum, palladium, and rhodium) as catalysts to induce chemical reactions that reduce the amount of pollutants in exhaust. Catalytic converters contain varying amounts of PGM catalyst applied to a ceramic substrate structure core (known as a "biscuit") enclosed in a steel case that is connected to the automobile's exhaust system. Because PGMs function as catalysts, these precious metals are not consumed in the chemical reactions that take place in the converter and PGMs retain their value and can be recovered and reused again and again. A collector of scrap converters can re-sell them whole or it can "de-can" them (cut open their shells) and sell the catalysts to a precious metal refinery.

Respondent, Scott Vollero ("Vollero"), had worked in the scrap converter recycling business through his company Autocats, Inc. ("Autocats")[1] for a number of years and had established a business relationship with Claimant, Toyota Tsusho America, Inc. ("TAI"). Vollero/Autocats would acquire used catalytic converters from many sources and de-can them,

---

[1] Scott Vollero is the sole respondent in this case, but, in a technical sense, some conduct was arguably that of Autocats, Inc., Vollero's company, rather than of Vollero himself. In order to streamline this Award, the name "Vollero" is generally used to designate either, and, as each was plainly the agent of the other, there is little basis for a distinction between them in drafting.

selling the PGM catalyst to TAI, among other purchasers.

From 2000 to 2011, TAI purchased the PGM coated cores ("biscuits") contained in catalytic converters from Autocats, becoming Autocats' primary customer during these years. During this same period, Mr. Vollero's specialized knowledge and experience in this aspect of the automobile recycling business became well-known to TAI. TAI came to view Vollero as the "best in breed" in this business.

The acquisition of used catalytic converters by recycling is capital intensive. Large amounts of money must be advanced to a network of independent buyers to acquire the used catalytic converters from auto wrecking yards, muffler shops, automobile repair facilities and the like. The independent buyers are often not particularly responsible or substantial business people, and they sometimes default on obligations, go bankrupt or disappear altogether; this issue dictates some unusual controls on cash, but those controls do not always prevent losses. TAI provided most of Autocats' working capital during the same 2000-11 time period through a line of credit that financed Autocats' purchase of used or scrap converters from a network of smaller collectors with which Vollero/Autocats had established relationships. In this scenario, TAI advanced money but had little control of what happened to it and little certainty over whether it would ever get it back, and this may have been an additional incentive for the joint venture transaction which would follow.

After Autocats acquired the scrap or used catalytic converters, they would de-can them and remove the biscuits, selling them to TAI, which then extracted and resold the precious metals. The value of the extracted PGM content received by TAI was then credited to the Autocats' line of credit extended to it by TAI. This in turn enabled Autocats to draw additional funds to purchase more scrap converters and the recycling process—of both PGMs and TAI's money—continued.

In addition to the TAI/Autocats/ Vollero business model described, Autocats also sold a smaller percentage of usually lower value whole uncut scrap catalytic converters, to customers other than TAI.

It was Vollero's specialized knowledge and experience in valuing and pricing the catalytic converters for purchase and sale in the recycling business that allowed Autocats to establish itself in this industry (as well as its outstanding four million dollar line of credit to Autocats) which drew the interest and attention of TAI.

**B. Joining Forces**

Beginning in 2008, TAI and Vollero began discussing a possible joint venture by which they would combine TAI's resources with Vollero's experience and knowledge of the scrap catalytic converter industry to form a new converter collection entity. Due to the state of the economy and the fluctuations in prices of precious metals, negotiations proceeded intermittently for a few years before an arrangement was consummated in the spring of 2011. Pursuant to an Assets Purchase Agreement dated as of May 16, 2011, TAI acquired, through a new subsidiary corporation, ELV Components Recycling Inc. ("ELV"), certain assets of Autocats. ELV was a corporation formed and funded in December 2010 by TAI for the purpose of collecting and selling scrap catalytic converter and/or extracting their precious metals content. Autocats and Vollero were then paid a total of $4.4 million for certain assets of Autocats to be integrated into ELV. TAI loaned ELV the funds for the transaction.

Of the $4.4 million purchase price, less than $400,000 was specifically allocated to the purchase of Autocats' hard assets. The balance of the purchase price paid by ELV was allocated to Autocats' goodwill. Vollero himself received an initial payment of $2.7 million with the balance to be held in escrow to be distributed at specific times (anniversary dates) as set forth in the Assets Purchase Agreement.

5

As part of the transaction, TAI agreed to make Vollero an executive vice president of ELV and allowed Vollero to purchase a 20% ownership interest in ELV for $400,000, using proceeds from the $4.4 million purchase price. When the Assets Purchase transaction was consummated, TAI owned 80% of ELV and Vollero owned the remaining 20%. ELV was capitalized at $2 million (TAI $1,600,000 and Vollero $400,000). Vollero also entered into a separate Employment Agreement with ELV, pursuant to which he agreed to work for ELV for five years. ELV also hired several other former Autocats' employees, including its plant manager, Dennis McElroy.

## C. Major Changes in Business Operations and Unprofitability

ELV was unprofitable from the very start as the new venture struggled. One major problem that developed was the inability to develop banking[2] relationships which manage and track cash advances made to a network of catalytic converter collectors to purchase the needed scrap product. This in turn caused ELV to fail to generate sufficient cash flow, requiring TAI to loan more cash to ELV to keep it afloat.

In addition, ELV made significant changes from the way Autocats had operated in the past:

First, an almost-entirely new workforce was required to be put into place because many of the Autocats' production or floor employees could not be hired on because of immigration issues. Second, due to equipment safety issues, ELV had to make changes to the machinery used to cut open the scrap converters to extract their contents.

Third, the modifications of the de-canners or cutters resulted in a significant decrease in the precious metals' dust (a valuable commodity) that was recaptured.

---

[2]Autocats had used a separate bank account for each collector, but Hirohito Haraguchi (originally a vice president of TAI, but, by then, president of ELV) wanted to change the setup and could find no American bank willing to deal with ELV because of the combination of large cash transactions and foreign ownership and the regulatory scrutiny, based on terrorism and currency control rules, this would bring. In another example of the "comic opera" Haraguchi era, ELV had to use old accounts, belonging to Autocats (which no longer existed!) to manage transactions.

Fourth, space and environmental concerns caused ELV to relocate its facilities.

Fifth, ELV decided to discontinue doing business with an entity known as A-1, which purchased whole uncanned catalytic converters of low grade. These low grade converters had proved to be a profitable line of business in the past for Autocats.

Sixth, ELV's new management made the decision to discontinue the acquisition and resale of "cores"[3]—scrap starters, alternators, air compressors, and other recyclable automotive parts which contain no PGM content, but in which business Autocats had profitably engaged in the past.

Seventh, ELV had considerable difficulties in keeping its key management positions filled: In two years, it changed presidents and (twice) controllers.

Eighth, ELV began downsizing its "buyer network;" though TAI's senior vice-president, Arthur Harrison, would testify on March 11 that these people are "the life blood of the business." ELV started with close to 30 buyers and, as of the time of the Arbitration hearing, had three left.

## D. Writing Off Goodwill

In December 2012, as ELV's financial performance continued to be poor, its outside auditors and management determined that indicators of "impairment" of the value of the goodwill it had purchased from Autocats existed, and accounting principles required the application of a "goodwill impairment test." The results of this accounting test required ELV to write-off the entire value of the goodwill it purchased from Autocats, in the sum of $4 million, as of the end of 2012. This write-off was reflected on the March 31, 2013 audited financial statement of ELV.

## E. Vollero's Past Discovered

Early in 2013, Anthony Dowgwilla, a long-time TAI employee who had been dispatched to help out at ELV, discovered information which led to an investigation of certain apparently illegal

---

[3]These are completely different items from the "cores" in catalytic converters, which are impregnated by PGMs.

activities previously conducted by Vollero and some other Autocats' employees. They had, it was learned, manufactured and imported counterfeit catalytic converters in and from China in the past (prior to the close of the sale-to-ELV transaction).

Vollero, after initial denials, ultimately admitted (in his deposition in this case) that, commencing in 2008, he worked with a college friend residing in China, John Mion, to obtain the counterfeits. Mr. Mion had contracted with a Chinese company to manufacture counterfeit catalytic converters which would contain little or no PGM content and therefore have little or no real value. Vollero further admitted that, at his direction, certain Autocats' employees imported approximately 30,000 of these counterfeit units with a plan to sell them to a customer, A-1, which only purchased whole used converters, as opposed to uncanned ones. Vollero mixed counterfeit units with authentic units to sell to A-1 in bulk. A-1 paid Autocats on a price-per-unit basis rather than by content of the precious metals that were reclaimed after the refining process took place. Vollero's expressed motivation for engaging in this scheme was to get back at A-1 for an ongoing business feud, but the Panel is more-than-skeptical that this was his only purpose (as opposed, for instance, to bringing in revenue) or that he only sold them to A-1.

The counterfeit catalytic converters were not sold to the general public, automobile repair stations or part facilities. Nor, importantly, were they sold to TAI .[4]

**F. Terminations**

After the discovery of Vollero's illicit conduct and after TAI's investigation of it, both Vollero and McElroy were terminated by ELV. Vollero was terminated from ELV effective June 13, 2013 for breach of his Employment Agreement with ELV and ELV directed the escrow agent

---

[4]This is not in dispute: In his opening statement on March 2, 2015, TAI's counsel said "there's no allegation here that he was selling us dogs pre-closing." "Dogs" were the counterfeit converters, while "cats" were legitimate ones.

not to release to Vollero the remaining final installment payment of approximately $876,424 due under the Assets Purchase Agreement and Escrow Agreement.

Very significantly, the write-off of ELV's goodwill occurred several months *before it learned about Vollero's counterfeit converter activity* and terminated him, and was solely because of ELV's financial performance.

### III
### PLEADINGS

The Claim in this Arbitration is brought by TAI and is against Vollero, as respondent. Mr. Vollero's Counter-Claim is against TAI and ELV.

TAI's original Demand for Arbitration, dated November 26, 2013, had contained six claims for relief, but, on February 23, 2015, Claimant's Pre-Trial Memorandum of Law announced an intention to proceed only on three of them, as follows:

First - Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962 (c)

Second - Conspiring to Violate RICO, 18 U.S.C. §1962 (d)

Third - Fraud

On December 19, 2013, Respondent Vollero filed an Answer and asserted the following Counter-Claims against TAI and ELV:

First - Breach of Fiduciary Duty

Second - Declaratory Relief

Third - Breach of Contract

Fourth - Breach of Implied Covenant of Good Faith and Fair Dealing

Fifth - Equitable Indemnity

Sixth - Invasion of Privacy

Seventh - Civil Code §1708.8 (Invasion of Privacy)

9

Eighth - Declaratory Relief

TAI's Complaint alleges, among other things, that Vollero operated a criminal enterprise through a pattern of racketeering involving the sale of counterfeit catalytic converters and defrauded TAI in failing to disclose Autocats' involvement with the sale of counterfeit catalytic converters. TAI contends that as a proximate result of the alleged fraudulent conduct it has been damaged by having paid an inflated purchase price for illusory corporate goodwill and incurred the formation costs of ELV and attorneys' fees in investigating and prosecuting these claims. Vollero's claims include allegations of breach of fiduciary duty in mismanagement that favors the majority shareholder's interests over the interests of the minority shareholder. He also seeks a Declaration that TAI must release to Vollero the remaining funds in escrow, which constitute the balance of the purchase price. He has withdrawn Claims Nos. 6 and 7.

At the Arbitration hearing, each side called witnesses and cross-examined opposing witnesses and offered documentary evidence. Upon simultaneous written briefs submitted to the Arbitration Panel, the issues were submitted for decision.

## TOYOTA TSUSHO AMERICA, INC.'S CLAIM

### I
### AWARD

**The Award is in favor of respondent Scott Vollero and against claimant Toyota Tsusho America, Inc.**

### II
### FINDINGS of FACT and DISCUSSION

The findings and legal analysis which follow are necessary to the Award, and are the result of the weighing of the evidence, both oral and written and the Panel's determinations as to credibility, relevance and meeting of the parties' respective burdens of proof.

**A. A Note on Scott Vollero**

10

The potential for its Award's appearing to endorse, or at least excuse, Scott Vollero's scheme to counterfeit converters was of great concern to each Arbitrator. Vollero's scheme was despicable, fraudulent in its intent and doubtless criminal. He was completely dishonest and has now admitted that.

But the Panel was formed by the parties objectively to go where the law and the facts of *this* case take it, not to decide who it likes or whose conduct it approves. This is not a criminal case, so punishing Vollero is not its objective and, unlike in a criminal case, the conduct must produce injury in order to be actionable.

### B. Proximate Cause of Damages

#### 1. Vollero's Prior Fraudulent Activity Did Not Proximately Cause TAI Any Damage

Scott Vollero and Sino Scrap, Inc.'s Arbitration Brief[5] opened so dramatically and surprisingly that one wondered if he/she were looking at the wrong document. It began: "Scott Vollero engaged in a brazen scheme to import and sell counterfeit catalytic converters . . . ."

A few lines later came the almost-equally dramatic "None of this cost claimants a dime."

This language was drafted and filed prior to the arbitration hearing, and it was a simple, clear and concise roadmap to the defense.

More importantly, *it was correct.*

The evidence claimant's able counsel produced in two weeks of hearing and thousands of documents never overcame it.

The Panel's view that TAI never demonstrated that Vollero's counterfeiting activities proximately caused any damage to ELV or TAI pervades nearly every aspect of this Award, so it is discussed first.

---

[5]This is what the document is called, though Sino Scrap is not a party to the Arbitration.

Respondent's brief[6] puts the requirements well:

> Proximate cause requires a direct link between the fraud (or in this case, omission) and the damages sustained. *See, e.g., Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal. App. 3d 1220 (1991) ("To recover damages for fraud, a plaintiff must have sustained damages proximately caused by the misrepresentation. [Citation] A damage award for fraud will be reversed where the injury is not related to the misrepresentation. [Citation]"). In other words, TAI must show that its damages were directly caused by Mr. Vollero's wrongdoing. And . . . TAI has not and could not have met that burden.

To prove actionable fraud, TAI would have to show that it relied on the misrepresentation or omission, and, for purposes of this discussion, the Panel will assume that it did and that it would not have purchased Autocats if TAI knew of the prior counterfeiting[7] and would adopt all of the findings described in the dissent under "I. The Counterfeiting Activity." But that assumption is not enough to merge the concepts of reliance and proximate cause or permit recovery without the latter: "Assuming ... a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes." (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 365, 17 Cal.Rptr.3d 39, citing *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 60, 248 Cal.Rptr. 217.) The law remains that "reliance and proximate causation are distinguishable, . . ." ( *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 870, 68 Cal.Rptr.3d 828) See also *Gold v Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 374, 122 Cal.Rptr. 732, which holds "[t]o state a cause of action at law based upon fraud, ... the plaintiff must allege not only reliance but

---

[6]The principal brief *after* the hearing by each party will simply be referred to as its "brief." Other briefings are referred to with specificity.

[7]The evidence probably tips in TAI's favor on this element, but, considering Haraguchi and Saada's willingness to lie and exaggerate to their superiors, it is not a stretch to speculate that if Vollero had revealed his counterfeiting to either of them, they would have told him to keep quiet. That *is* speculation, and not a basis for this Award, but can anyone reading Haraguchi's March 5 cross-examination say the speculation is outlandish?

that, by reason of the fraud, he has suffered pecuniary damage in some amount." Clearly, in addition to reliance, TAI must prove that Vollero's omission *caused* damages.[8]

It is important to an understanding of this Award that it does not discuss "preponderance of the evidence" or "burden of proof" and these absences are not happenstance:

There was *no* evidence of proximately caused damage.

TAI argues that "it never would have done this deal if it had known [Vollero] was a criminal." It contends consequently that it is "entitled to the return of the $4.4 million it paid for a worthless investment in a criminal." (TAI brief, p. 2). While, as noted above, we assume, without deciding, that TAI would indeed not have made the deal, it must prove all of the elements of fraud, including damages resulting from the fraud. TAI has not presented any evidence that Vollero's counterfeiting impacted the value of ELV. *Calling* its investment worthless is not enough to establish a claim for fraud, TAI was required to *prove* that the fraud devalued its investment through admissible evidence. (*See Gonsalves v.Hodgson* (1951) 38 Cal.2d 91, 237 P.2d 656.) TAI has failed to present evidence to show that Vollero's counterfeiting caused any loss to, or diminution in the value of, ELV. "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages. (citations omitted) And the damages suffered must be referable to, and caused by, the fraud. (citations omitted)." *Conrad v Bank of America* (1996) 45 Cal.App.4th 133, 159. "Deception without loss is not actionable." *Creative Ventures LLC v. Jim Ward Ass.*, (2011) 195 Cal.App.4th 1430, 1444, citing *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364.[9]

---

[8]The Arbitrators have not cited a great many cases in this Award. This is for two reasons: First, arbitrators are not to make their work look like courthouse litigation and are to adhere to "broad principles of justice and equity . . ." (*Moncharsh v. Heily & Blase* (1992) 3 Cal. 4th 1, 10, 10 Cal. Rptr.2d 183.) Second, the legal issues here are not "close calls" and the principles relied upon are not controversial. The Panel's rulings do not require string citation support.

[9]A defrauded party seeking only rescission need not show pecuniary damages. TAI is not seeking

### 2. What *Did* Damage TAI?

Given an express finding of a lack of proximate cause, it is arguably not necessary for the Panel to discuss what did cause the damage, but some of the cases (E.g, *Goehring,* at 365) suggest the importance of "unrelated causes." The substantial evidence of TAI's woes in its ELV adventure, already listed in the "Major Changes in Business Operations and Unprofitability" subsection above, can be recapped and expanded on a bit as follows:

What was probably TAI's most profound problem occurred before it ever invested in ELV, when TAI's own executives "sold" its board of directors on business volume projections (ex. 10016) which were—to be charitable—utter nonsense. They gave their Board projections that the Autocats' business would *triple* when taken over by a Toyota entity! Being less charitable, the Arbitrators note that Messrs Haraguchi and Saada (assistant vice president and general manager of TAI) intentionally misrepresented those projections to their own company, and the Panel cannot escape the belief that others knew of the misrepresentations.

Exhibit 10253, for example, finds Mr. Neyens, TAI's vice president in charge of business development writing that "Haraguchi is more interested in just getting a deal done and doesn't seem to care if it's a good deal for TAI." And the false projections to "get the deal done" were clearly a very "big deal." Mr. Neyens stressed that "developing forecasts for any business is the most difficult and critical part of any valuation exercise." (Ex. 10154)

Amazingly, Mr. Saada himself would testify (on March 9) that *none* of the potential suppliers listed in the marketing strategy (ex. 10016) *ever* wound up selling any converters to ELV!

---

rescission. *Engalla v. Permanente Med. Group, Inc.* (1997) 15 Cal.App.4th 951, 979.

But the several other problems listed in the "Major Changes in Business Operations and Unprofitability" subsection would arise as ELV began to operate in an "only in L.A." scenario, apparently TAI's managers did not reasonably anticipate that employees who spend their days cutting open parts from the undersides of used cars might not have pristine documentation of their immigration status. Laudable (and legally-required) though Toyota's insistence on "going by the book" may have been, ELV's firing virtually all of its shop floor employees and replacing them with "temps" (whose papers were good, but whose job skills were not) caused major production disruptions. (There was evidence to the effect that management was forewarned of this issue, but did not attempt to develop a trained workforce to deal with it.)

The floor employees were not the only ones changed, though: In its first two years, ELV changed presidents once and controllers twice.

Production disruptions were made considerably worse by TAI's determination to improve machinery guarding and safety. The Panel would also call this laudable corporate behavior, were it not for then-ELV president Haraguchi's later—and secret—determination to go back to using the machines already declared unsafe and covering up this use. Whatever the merits of the safety issues, they caused considerable additional production delays, as did relocation from Autocats' former facilities.

Collection of the dust left over from harvesting PGMs from converters was an issue about which most of us would not have thought, but the dust is valuable, and ELV may have squandered as much as a million dollars worth of it. (Vollero would testify on March 4 regarding several documents about dust (*e.g.,* ex. 10484).)

ELV's managers also unaccountably decided to discontinue doing business with A-1 (ironically, the same company targeted by Vollero's counterfeit scheme of several years earlier),

which purchased whole uncanned catalytic converters of low grade. These low grade converters had proved to be a profitable line of business for Autocats in the past.

ELV's new management also decided to discontinue the acquisition and resale of cores—scrap starters, alternators, air compressors, and other recyclable automotive parts which contain no PGM content, but which had been a source of profit in the Autocats days.

Finally, the virtual elimination of its buyer network, "the life blood of the business," seems to have had a dramatic impact on ELV's business prospects.

### 3. Proximate Cause in RICO Actions

The basic RICO statute is 18 U.S.C. §1962. It proscribes the now-well-known "pattern of racketeering activity" upon which claimant places emphasis and also, at subsection (d), makes it "unlawful for any person to conspire to violate any of [its] provisions . . . ."

18 U.S.C. §1964(c) states that (c) "[a]ny person injured in his business or property *by reason of* a violation of section 1962" has civil remedies, including even treble damages. "[B]y reason of" is another way of saying "proximately caused by."

The 2002 Ninth Circuit case of *Chaset v. Fleer/Skybox International, LP* (300 F.3d 1083, 1086) could not be much stronger for respondent here, holding, as it does that a plaintiff who fails to demonstrate proximate cause *lacks standing* even to sue.

While the Arbitrators here have tried to avoid the "long quote" a bane of good legal writers—*Chaset*'s language and the citations it includes comprehensively resolves any question about a proximate cause requirement in a RICO case

> To prevail on a civil RICO claim, a plaintiff must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property. 18 U.S.C. §§ 1962(c), 1964(c). The "fifth element includes two related components. First, a civil RICO plaintiff must show that his injury was proximately caused by the [prohibited] conduct. Second, the plaintiff must show that he has suffered a concrete financial loss." *Fireman's Fund Ins. Co. v. Stites,*

258 F.3d 1016, 1021 (9th Cir. 2001) (citation omitted). * * * Congress enacted RICO "to combat organized crime, not to provide a federal cause of action and treble damages" for personal injuries. Id. at 786.

Therefore, "a RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation.'" *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 279, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring) (alteration in original) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Moreover, the defendant's violation of § 1962 must be the proximate cause of plaintiff's injury. *Id.* at 265-68, 112 S.Ct. 1311.

Even assuming the sale of counterfeit converters constituted a pattern of racketeering activity, the scheme for their sale was neither aimed at, nor anticipated to injure, TAI and certainly did not injure TAI. Nor is there evidence it continued after the merger.

Claimant's "Conspiracy to Commit RICO" allegation is more obscure, though the simplest thing to say about it is that there is even less evidence of proximate cause than in the case of the RICO allegation itself. Quite apart from not causing TAI harm, the scheme to build and sell fake converters, while perhaps having Vollero, Mion and their other connections in China as "conspirators," was long before ELV was even formed and before any Toyota entity had any relationship to Vollero, other than as a buyer of PGMs.

However much the Arbitrators may disapprove of the 2008 Vollero scheme, it is impossible to consider TAI (or ELV) as having been a *victim* of it. *Lerner v. Fleet Bank, N.A.* 318 F.3d 113, 124 (2d Cir. 2003) states "we have repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise." (Several cites omitted.)     Federal cases seem to differ on the issue of whether one can be criminally liable for a conspiracy to violate RICO without an underlying RICO substantive violation. (*See, e.g., United States v. Fernandez*, 388 F.3d 1199, 1231(9th Cir. 2004).)

17

This issue makes more sense in that criminal context than it does here because discussions of criminal cases focus on predicate acts, underlying substantive crimes and the like.

### 4. Proximate Cause in Fraud Actions

Claimant does not argue that there was "actual fraud" (see Civil Code §1572) in this case. Instead, it contends that Vollero made a "fraudulent omission." TAI is correct in asserting that, '[u]nder California law, the elements of a common-law claim for fraudulent omission are:

> (1) the defendant concealed or suppressed a material fact;
>
> (2) the defendant was under a duty to disclose the fact to the plaintiff;
>
> (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff;
>
> (4) the plaintiff was unaware of the fact and would have acted differently[10] if she had known of the concealed or suppressed fact; and
>
> (5) the plaintiff sustained damage as a result of the concealment or suppression." (Claimant's brief, p. 28)

Even if the Arbitrators concede, for the sake of argument, the first four factors, the "damage *as a result of* the concealment" issue remains, and is insurmountable for TAI.

California's Civil Code, at § 3343, also speaks of the proximate cause issue. It speaks of the recovery of damages in fraud cases, but requires they "shall be recoverable only if and only to the extent that all of the following apply: * * * (iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it." (§ 3343(a)(4).)

While the discussion and citations in B. 1., "Vollero's Prior Fraudulent Activity Did Not Proximately Cause TAI Any Damage" above were intended as a general discussion of proximate cause, the material cited there all comes from fraud cases.

---

[10]The "would have acted differently" phrase is alluded to in fn. 6 and is questionable in this case.

**5. Vollero's Worthlessness did not impact ELV's Worth**

TAI's conduct *before* learning of Vollero's counterfeiting is very telling. First, in their Application to the Board to approve the transaction, Saada and Haraguchi do not attribute any appreciable economic or goodwill value to Vollero, let alone the entire $4 million. Instead, Saada and Haraguchi supported the transaction and the proposed price with fabricated and inflated projections predicated only minimally upon Autocats' then existing business, and *largely upon TAI sources*. Second, by December 2010, before TAI had a hint of Vollero's prior wrongdoing, ELV deemed Vollero's knowledge and expertise worthless, as it wrote off all of the goodwill.

Admittedly, ELV lost Vollero's expertise once it fired him. TAI apparently claims, but fails to prove, that losing Vollero's expertise has caused the loss of their entire $4.4million investment. Importantly, ELV has not folded. More to the point, TAI recognizes ELV's real value as it continues to invest more capital in its operations. Saada and Haraguchi's Application to the Board highlighted the multiple benefits of "Newco" to TAI, some of which TAI still derives. (The need to inject this capital into ELV is unrelated to Vollero's counterfeiting or his lost expertise, but is instead related to factors *entirely independent* of Vollero.) Even *with* Vollero, ELV was failing to meet budget, incurring large losses and showing a negative equity position. These "damages" were caused by factors unrelated to the deceit regarding Vollero's counterfeiting.

Finally, TAI offered no evidence establishing that Vollero's criminal history or counterfeiting operation in and of itself *proximately caused,* or even had some *identifiable* empirical economic cost, such that it reduced the value of ELV. Of course, TAI did not want to work with a crook and we will assume *arguendo* they never would have gone forward if they knew he was a crook. But this argument gets them nowhere, as they cannot unwind the deal. Given this limitation, they must prove, how and to what extent this omitted fact results in the loss of value of ELV, an entity that continues to operate and benefit TAI.

19

### 6. Factors that Did Injure ELV and/or TAI[11]

TAI *arguably* suffered losses from its investment in ELV and that subsidiary's poor financial performance in its early years. In addition to the important factors discussed in both the "Major Changes in Business Operations and Unprofitability" and "What *Did* Damage TAI?" subsections above, two others bear mention:

#### a. Mismanagement

Arthur Harrison is, and was, the head of the Metals Division and a senior vice president of TAI since 2008; he is now also president of ELV and is in a good position to know how it has performed since its creation. He testified, on March 11, that there were "so many issues at ELVCR[12] it is overwhelming," and they included a "culture of mistrust "among its top management. The Arbitrators take Mr. Harrison at his word, but they need not, as *dozens* of emails received in evidence emphasize intra-management relationships looking more like a Hollywood divorce than a functioning business entity. A handful is illustrative:

- Exhibit 10166, as recently as 2014, finds one executive calling Haraguchi[13] "even worse than" yet another (Okamura), and "being very upset about his attitude;" "he should have been fired." *Instead of firing him, TAI made him ELV's president!*

- Exhibit 10021also speaks of Haraguchi, and says "If [he] is trying to negotiate to go around company policy there will be repercussions."

---

[11]TAI is the sole claimant in this case, so only it can seek damages here. TAI did not, of course, wholly own ELV; Vollero himself owned 20% of it. In a technical sense, therefore, damage to TAI and damage to ELV are not the same, but for all practical purposes, damage to one is damage to the other.

[12]"ELVCR" is the same entity as "ELV." The former term was used by most witnesses in the hearing, but the shorter "ELV" is generally used in this Award.

[13]Mentioning complaints about Haraguchi is not meant to suggest there was not criticism about, or backbiting between, other executives and managers.

- Exhibit 10253 says "Haraguchi's communication regarding a TAI negotiating position is completely unacceptable . . . ."

It cannot be emphasized enough that the dreadful communications between executives involved in the ELV venture were constant and at the very top of the management chain. Some of the messages were "behind the backs of" the executives under discussion, while others freely "copied" extremely unkind remarks to the managers they were about. At the least, they give the reader an unexpected glimpse into management communications relationships in Japan's largest corporate empire.

- Exhibit 10024, for example, finds Arthur Harrison's decrying being "sick and tired of being informed after [events]," that "Haraguchi feels absolutely no need to report anything to me," of "unacceptable" communications practices and "continued deceptive practices of this management team [which] are unacceptable to me."

### b. The Economy

While economists generally claim that the worst of the "Great Recession" was over by the time ELV was put together, several of the witnesses indicated that general economic conditions damaged its business. This point was not much explored in the evidence.

### c. Is It Certain that TAI Has Been Injured?

The word "arguably" was used advisedly above in conceding that TAI probably suffered losses because Arthur Harrison opined, in his testimony of March 11, that *ELV will be profitable by the fiscal year ending March 31, 2017*. While it is beyond the Panel's purview to speculate about the future of TAI's investment in ELV, it is certainly possible that it will work out to its advantage.

Insuring a reliable supply chain in PGMs was a significant reason for the investment, independent of profit motivation, and that would seem to remain a benefit.

### d. A Last Tantalizing Question about Vollero's Impact

Much has been said in this Award about the causes of ELV's poor performance (thus far) and its not having been caused by Vollero; all the causes at least began before discovery of his misconduct. TAI does not argue that mismanagement or things like changing line employees, buildings and equipment were caused by Vollero, and the evidence is that Haraguchi *et al* ignored considerable advice from him.

So, what if ELV's fortunes had been better? *What if, by early 2013, it was making great profits before the revelations about Vollero's past?* Would he have been fired anyway? Would this Arbitration have gone forward in the complete absence of any operating losses?

## SCOTT VOLLERO'S COUNTER-CLAIM

### I
### AWARD

**The Award is in favor of counter-claimant Scott Vollero and against counter-respondents Toyota Tsusho America, Inc. and ELVCR Components Recycling, Inc. and is a declaration that ELVCR must inform the Escrow Agent that any amounts remaining in the Escrow Account—less $120,000—are to be released to Vollero.**

### II
### RECAP of PLEADINGS

#### A. Vollero's Counter-Claim

As indicated above, Respondent Vollero filed an Answer and asserted the following Counter-Claims against TAI and ELV (He has dismissed the 6th and 7th):

1st - Breach of Fiduciary Duty

2nd - Declaratory Relief

3rd - Breach of Contract

4th - Breach of Implied Covenant of Good Faith and Fair Dealing

5th - Equitable Indemnity

8th - Declaratory Relief

**III**
**FINDINGS of FACT and DISCUSSION**

Most of Counter-Claimant Vollero's eight causes of action are essentially "defensive" and require little discussion:

**5th - Equitable Indemnity**

This claim was contingent upon an adverse finding in TAI's Claim and requires no further discussion.

**1st and 4th - Breach of Fiduciary Duty, Breach of the Implied Covenant of Good Faith and Fair Dealing**

The Panel finds no evidence to support these causes of action: While, strictly speaking, California's version of the "business judgment rule" only insulates corporate *directors* from liability for what plaintiffs believe to be poor business decisions, the concept is often expanded by analogy to other business conduct, which should be "accorded a substantial level of deference." (*E.g., Etheridge v. Reins Intern. California, Inc.* (2009) 172 Cal.App.4th 908, 927, 91 Cal.Rptr.3d 816.)

While Vollero's Closing Brief Concerning Cross-Claims Against TAI And ELVCR accurately criticizes many of the TAI and ELV management moves (even being unable to resist including some of the "comedy of errors," such as being unable to store cores for lack of a roof on a shed) these facts are inadequate to show a conflict of interest, managerial self-dealing or a lack of good faith. This Award has dwelled on their being "dumb," and maybe even "incompetent," as Vollero argues, but they were not motivated by ill will toward him.

**2nd - Declaratory Relief (as to Vollero's Conduct Causing No Damage)**

23

This cause of action is reciprocal to, and duplicative of, Claimant's case. As such, it requires no action by the Panel.

## 3rd - Breach of Contract

ELV's decisions to exit certain lines of business are covered by the Panel's expanded view of the business judgment rule, and surely a company cannot be required to *stay* in an endeavor simply because it listed it in the Shareholders Agreement as an aspect of the "Scope of the Joint Venture" (Article II, §2.01). Interestingly, §2.01's language is expansive on its abilities to *enter* other lines of business, but does not expressly give it the power to *stop* doing something. Such a provision (or lack of one) may even be in violation of the public policy related to a board of directors' authority.

Moreover, the allegations are of conduct which would damage all shareholders proportionally to their shareholdings and would, regardless of their merits, be derivative. As a claim on behalf of the corporation, it is beyond the scope of the arbitration clause here.

## 8th - Declaratory Relief

Counter-Claimant argues that "Mr. Vollero is therefore entitled to a declaration that ELVCR must inform the Escrow Agent that any amounts remaining in the Escrow Account—less $120,000, which Mr. Vollero agrees should go to ELVCR for an unrelated debt—should be released to Vollero. This amount would be $756,424 (*i.e.,* $876,424 - 120,000).[14]

The funds in the Escrow Account were a part of the purchase price for Autocats, and must be released to him in view of the finding that he has no liability on TAI's claim.

---

[14]The panel is unclear, as were counsel at the time of the Arbitration hearing, as to the existence of interest in this account, and can deal with that issue at the time such further hearing as may be required on the attorneys' fees issues. It may be that a declaration that Vollero is entitled to $756,424 (i.e., $876,424–120,000) plus the 756,424/876,424ths of any interest in the account, but this is uncertain (is, for instance, the $120,000 offset the same age as the principal balance?) Counsel can deal further with this issue and perhaps resolve it among the parties.

24

A claim for declaratory relief in an arbitration is unusual, in that an arbitration award is, itself, rather like a declaration (though it requires court action to become a judgment), but the Panel does not see this cause of action's unconventionality as a basis for denying the relief sought, as it appears merited by earlier parts of this Award.

## COSTS AND ATTORNEYS' FEES

California Civil Code §1717 provides for an award of "attorney's fees in addition to other costs" to the "party prevailing on the contract, ...." At §(b)(1), however, the statute provides that "[t]he court may also determine that there is no party prevailing on the contract for purposes of this section." This language was added in 1987, and there is neither any case construing it nor any statutory history available explaining the reasons for it.

The logic of §1717 is completely consistent with traditional views of arbitrators' abilities to "base their decision upon broad principles of justice and equity,..." (See *Moncharsh v. Heily & Blase*, (1992) 3 Cal. 4th 1, 10, 10 Cal. Rptr.2d 183.).

While the panel has determined that TIA has failed to prove its case, Mr. Vollero does not come before the forum with anything approaching clean hands.

The Arbitrators find that there is no prevailing party and, accordingly, award no costs or fees.

///

///

///

///

///

///

///

25

The administrative fees and expenses of the AAA/ICDR totaling $27,100.00 are to be borne as incurred. The compensation and expenses of Arbitrators totaling $300,092.50 are to be borne as incurred.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Los Angeles, California, United States of America.

Date: August 4, 2015

**Patricia Collins**
**Neutral Arbitrator**

**Eric E. Younger**
**Neutral Arbitrator**

# FINAL AWARD

## CONCURRING OPINION WITH RESPECT TO TAI'S CLAIM 1 AND CLAIM 2

The undersigned hereby concurs with the result reached by the majority as to Claims 1 (18 U.S.C § 1962 sub. (c)) and 2 (18 U.S.C. § 1962 sub.(d)), as set forth below.

RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff. *Oscar V. University Students Co-Operative Ass'n*, 965 F. 2d. 783, 786 (9th Cir. 1992).

In brief, to establish a civil RICO claim under 18 U.S.C. § 1962(c), the Claimant must prove each of the following five elements:

1. that an "enterprise" existed;

2. that the enterprise engaged in, or had some effect upon, interstate or foreign commerce;

3. that the defendant was employed by or associated with the alleged enterprise;

4. that the defendant knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the alleged enterprise; and

5. that the defendant did so knowingly and willfully through a pattern of racketeering activity.

Fifth circuit Model Jury Inst. No. 8.1; *see also Ove v. Gwinn*, 264 F. 3d 817, 825 (9th Cir. 2001) (to establish a civil RICO claim, the plaintiff must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiff's business or property). The Ninth Circuit has adopted the Fifth Circuit Model Jury Instructions in this regard.

While Claimant spells out a detailed analysis of the elements of a RICO offense, it offered little, if any evidence at the hearing to establish that the RICO violation must be a "but for" and proximate cause of the Claimant's RICO injury. *See Holmes v Secs. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). In evaluating proximate cause, "[t]he test is whether the injury is reasonably foreseeable or anticipated as a natural consequence." *Protter v. Nathan's Famous Sys*, 904 F. Supp 101, 110 (E.D.N.Y. 1995); *Rezner v. Bayerische Hypo-Und. Vereinsbank AG*, 630 F. 3d 866, 873 (9th Cir. 2010). TAI has also claimed that Vollero conspired to violate RICO. This claim requires an underlying RICO violation. See, e.g., *United States v. Fernandez*, 388 F. 3d 1199, 1231 (9th Cir, 204) citing *United States v. Bennett*, 44 F. 3d 1364, 1374 (8th Cir. 1995). In essence, Claimant failed to prove that "but for" Vollero's conduct TAI suffered a RICO injury directly related to the said activity.

An extensive treatise on civil RICO litigation offers a clear understanding of congressional purpose in creating RICO and its civil action provisions. (See, *RICO – A Guide to Civil Litigation in Federal Court*, Solovy, Rees & Tarantino (2011), published by Jenner & Block):

> Congress passed RICO in 1970 as part of a comprehensive legislative package aimed at combatting the influence of organized crime…. (p.II-1)
>
> When it enacted RICO, Congress included a civil remedy provision that allowed private parties to sue for injuries to their business or property caused 'by reason of" a defendant's violation of RICO. Under this provision, a private plaintiff may sue in state or federal court to recover treble damages and attorney's fees caused by RICO violations. (p. II-2)
>
> For the most part, courts have rejected arguments that civil RICO must be limited to conduct traditionally associated with organized crime. Nevertheless, because RICO applies only to organized long-term criminal activity, courts do not apply it to ordinary business disputes. Courts have regularly and consistently found that it is an abuse of the RICO statute to attempt to shoehorn an ordinary business or contractual dispute into a civil RICO cause of action. *Calcasieu Marine Nat'l Bank v Grant*, 943 F. 2d 1453, 1463 (5th Cir. 1991). (*"Although Congress wrote RICO in broad,*

> *sweeping terms, it did not intend to extend RICO to every fraudulent commercial transaction...*"); *Midwest Grinding Co. v Spitz*, 976 F. 2d 1016, 1025 (7th Cir. 1992)... Such abuse can have unusually deleterious effects on a defendant because of the inevitable stigmatizing effect of RICO claims and the public charges of fraud often used to support them. (pp. II-3-4).

As will be stated below, Vollero's conduct may be fraudulent, but does not appear to have been the sort of criminal-like conduct that RICO was intended to curtail in the facts presented here. For the reasons set forth, the undersigned concurs in the majority opinion with respect to Claims 1 and 2.

## DISSENTING OPINION WITH RESPECT TO TAI'S CLAIM 3

The undersigned respectfully dissents with the result reached by the majority as to Claim 3 (Fraud), as set forth below.

Unlike the RICO claims, here the Claimant, TAI, has proved all of the elements constituting the claim for fraudulent omissions by clear and convincing evidence. Under California law, the elements of a fraud claim based upon a suppression of a fact are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently if he/she had known of the concealed or suppressed fact; and (5) the plaintiff sustained damages as a result of the concealment or suppression. See California Civil Code §1709 and §1710. See also *Engalla v. Permanente Medical Group, Inc.,* 15 Cal. 4th 951, 974 (1997) and *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1108 (1988).

As summarized, the evidence shows that: (1) Vollero and his co-conspirators engaged in a fraudulent scheme involving the manufacture, importation and sale of counterfeit catalytic

29

converters; (2) Vollero and his co-conspirators, including other Autocats' employees, engaged in this counterfeiting activity throughout the three-year period (mid-2008 through mid-2011) in which Vollero negotiated a potential joint venture with TAI; (3) TAI relied upon Vollero's experience and expertise in the scrap converter industry as a critical component to the completed venture to be known as ELV; (4) TAI made the decision to loan the new venture $4.4 million to purchase Autocats from Vollero; (5) Vollero never disclosed to TAI before the transaction closed that he (Vollero) had masterminded and oversaw a counterfeiting operation in the very industry (scrap converter recycling) in which he was being paid to partner with TAI; (6) TAI would never had entered into the new venture transaction if it had known the true facts of Vollero's involvement in the catalytic converter counterfeiting scheme; and (7) TAI would never had loaned the money to ELV to finance the acquisitions of an Assets Purchase Agreement entered into between the new venture and Autocats/Vollero in May of 2011.

# I

## THE COUNTERFEITING ACTIVITY

At the Arbitration Hearing, Mr. Vollero admitted that he "engaged in a brazen scheme to import and sell counterfeit converters through his company, Autocats, Inc."  Tr. 233:24-234:4. Vollero admitted that beginning in 2008, he contracted with a Chinese company to manufacture counterfeit converters (that he and his co-conspirators referred to as "dogs") and that he had manufactured and imported approximately 30,000 of these counterfeit converters in thirteen separate shipments from China for the purpose of reselling them to competitors here in the United States.  Tr. 234:5-236:23; 252:25-254:6.

The evidence also showed that Vollero created a network that was highly organized and far-reaching. Vollero, the architect of the scheme, directed its operations.  Tr. 235:8-9, 246:17-22,

282:3-10, 291:25-294:21, 331:8-11.  He controlled all aspects of the counterfeiting scheme; indeed, it was Vollero's knowledge and expertise with catalytic converters and the industry that made the whole scheme possible.  Vollero and Autocats arranged and paid for molds of certain converter types for their Chinese manufacturer "Rudy" (real name Lao Lui) to facilitate the manufacture of authentic appearing counterfeits. Tr. 282:3-10; Exhibit 293.  Vollero oversaw the manufacturing process, providing detailed instructions to his co-conspirators John Mion and Rudy based on Vollero's experience and knowledge of the industry, and also supervised the manufacture of the counterfeit converters in terms of weight, color, rust, matting, and various other factors—even personally showing Rudy in China how to get the precise color correct on certain units.  Tr. 366:9-373:15, 376:2-381:18; Exhibits 283, 284, 526, 505, 310, 374. Vollero traveled to China for the purpose of creating more authentic looking units, and set up a slush fund with Mion to further their operations in China. Tr. 302:25-303:4, 333:20-334:17, 370:22-24; Exhibit 723.  Vollero provided detailed feedback to Mion and Rudy on counterfeit units needed to be "reworked" in order to be saleable.  Tr. 291:20-292:21; Exhibit 354.

Once the fake counterfeit converters arrived at Autocats' Harbor City facility in California, Vollero supervised the further refinement of the units, directing his plant manager, Dennis McElroy, and other Autocats' employees to detail certain units that needed extra "conditioning" to appear real enough so as to escape detection.  Tr. 266:19-267:17, 387:6-388:23, 957:22-959:19; Exhibit 715. Vollero then distributed counterfeit converters to buyers through low level peddlers. Tr. 963:18-966:16. Vollero had his Autocats controller James Bledsoe wire money to China to fund the illicit operations.  Tr. 327:15-328:8, 330:22-331:16; Exhibits 292, 329.

The fraudulent operation was run by Vollero, but extended beyond him to Autocats' employees working at his direction, and to Vollero's co-conspirators in China.  Rudy manufactured the units in China pursuant to Vollero's specifications.  Tr. 252:25-253:8, 282:3-10.  John Mion,

Vollero's college friend who resided in and managed counterfeiting operations in China, was the liaison to Rudy and to Vollero and coordinated the manufacture and acquisition of counterfeit units in China, exchanging hundreds of emails with Vollero to plan and execute the fraudulent scheme. See, e.g., Exhibits 308, 289, 288, 575, 600, 293, 328, 354, 405, 326, 336, 418, 515, 286, 415, 462, 292, 411, 329, 334, 514, 296, 298, 392, 401, 349, 283, 284, 526, 310.   The conspirators also used the bank accounts of Mion's wife, Caroline Mion, to receive monies sent to China for counterfeit operations.   Tr. 327:15-20, 348:19-349:3; Exhibit 298.   Bledsoe, the Autocats' controller, wired funds to China to cover Mion's commissions on sales and fund the acquisition of counterfeit units made by Rudy.   Tr. 328:1-6, 335:24-336:2.   McElroy, Vollero's plant manager, was also deeply involved in the scheme, overseeing the process of detailing the units from China that did not look real enough to pass inspection, shipping some units back to China for their rework, and writing the instruction manual containing detailed procedures that Autocats' workers used to further rework the converters.   Tr. 266:19-267:17, 387:6-388:23; Exhibit 715.

Vollero's enterprise also swept in lower-level Autocats' employees working at the direction of Vollero and his counterparts, as well as third parties.   Autocats' employee Alfredo Lopez worked on the units himself and supervised other Autocats' workers who detailed units at Autocats' Harbor City facility.   Tr. 957:22-959:19, 970:11-24.   Lopez explained at the hearing how he was instructed not to use Autocats trucks when Vollero and his co-conspirators were selling loads of counterfeit units to local competitors.   Tr. 963:16-966:22.   Lopez also testified that, after receiving the first load of counterfeits, he told McElroy that it was wrong to rework units and sell them, but was instructed by McElroy that: "business is business."   Tr. 971:25-973:10. Others, such as Mike McElroy and George Kimani (a/k/a "Rama") sold smaller batches of counterfeits to local competitors so that these buyers would not suspect the product came from Autocats.   Exhibits 891 and 911.   Vollero

also had one of his suppliers, Ken Ransford, dispose of a load of "bad or junk cats" on a collector in Canada. Tr. 1023:15-1027:21.

Vollero's fraudulent scheme was motivated by a desire for profit and to drive his competitors out of business at a time when market conditions were challenging for all engaged in the catalytic converter recycling business. Vollero used his expertise to deceive buyers, determining what percentage of counterfeits Autocats could (or should) sell to a customer at any given time, based on the market conditions and the particular customer's sophistication. Tr. 244:10-16, 246:1-7; Exhibits 288 and 600.

The evidence showed that the purpose of the operation was to sell as many counterfeit units to as many buyers as possible and to make as much money as possible. In 2008, Vollero wrote to Mion to lay out the fraudulent scheme in detail, covering "Organizational Issues," "Assumptions," and estimated calculations of their gross profit per each counterfeit unit. Exhibit 723.

Vollero continued the fraudulent scheme throughout the three-year period he was negotiating with TAI concerning a potential joint venture. Tr. 246:23-247:6. In mid-July 2010, less than a year before the proposed joint venture transaction closed and right at the time the TAI Board of Directors was about to approve the proposed joint venture transaction, Vollero informed Mion that he was "[t]rying a new outlet for dogs next week."

Vollero also admitted, when confronted with the evidence at the hearing, that the last shipment of counterfeit units arrived post-closing, and that he arranged for this load of counterfeits to be sent to ELV, the new venture, while he was an Executive Vice President of the company. Tr. 314:4-17, 317:6-17; Exhibit 418 (in August 2011, Mion writes, "Regarding this container, it is comprised of all cats and dogs <u>chosen</u> <u>by</u> <u>you</u> ...") (emphasis added). Vollero testified that this post-closing shipment contained counterfeit units and that he instructed Dennis McElroy (who was also an ELV employee at this time) to segregate these units once they arrived at ELV. Tr. 309:3-16,

33

314:4-17, 318:3-11; Exhibit 515. Vollero also wrote to Mion after the new joint venture transaction closed and while he (Vollero) was an Executive Vice President of ELV, attaching a September 2010 sales report for the counterfeit units previously sold by Autocats. Tr. 319:21-320:4, Exhibit 286.

## II

### THE JOINT VENTURE AND THE FAILURE TO DISCLOSE

TAI considered Scott Vollero a "rock star" in the catalytic converter recycling business. From 2000 to 2011, TAI purchased from Vollero's Autocats, what are referred to as, PGM coated cores or biscuits contained in the catalytic converters.

Autocats removed the biscuits from scrap catalytic converters and sold them to TAI, which in turn, extracted and resold the recaptured precious metals through a refining process. TAI also provided most of Autocats' working capital through extending a line of credit to Autocats. Autocats would use the line of credit to purchase scrap recyclable catalytic converters from a network of smaller collectors, muffler shops, automobile scrap yards and the like.

The value of the PGM content received by TAI after the refining process was completed by TAI was credited by TAI to Autocats' line of credit. This enabled Autocats to draw additional funds against the credit line to purchase more scrap converters. In addition to harvesting PGM cores or biscuits from cut and de-canned scrap catalytic converters, Autocats also sold a smaller percentage of lower value whole scrap converters to other customers.

TAI executives testified that as early as 2007, TAI was looking for alternate ways to acquire PGM cores or biscuits from various sources. TAI wanted to reduce the risk of advancing lines of credit or funds to independent collectors of scrap catalytic converters. In addition, TAI was looking to establish a "car-to-car total recycling business." TAI was looking for sustainable growth and a dependable supply line for the long run. Various acquisitions and relationships to establish its own

34

network was considered. Under consideration were as many as 10 companies. One of the acquisitions or relationships that was under consideration was with Autocats, owned by Scott Vollero.

Farid (Fred) Saada, in 2007, was an Assistant Executive Vice President and General Manager of TAI's nonferrous PGM Section 133 group. Saada met Vollero in 1990 when Saada was in business and was developing relationships with collectors of catalytic converters. Vollero, at that time, was working for a company by the name of Master Mining, a division of Pick-a-Part. A business relationship developed at that time and when Vollero formed Autocats, Saada was employed by TAI on the East Coast. That was the start of the TAI, Autocats, Vollero relationship beginning in approximately 2000. TAI offered Autocats a refining agreement and advanced funds though a line of credit that Autocats used to finance its business operations.

Based upon the length of the TAI, Autocats, Vollero relationship and the fact that Mr. Saada trusted Vollero and thought him to be competent and knowledgeable in the catalytic recycling business, Saada recommended Autocats and Vollero to joint venture with TAI going forward. In 2008, TAI and Autocats/Vollero began negotiating a possible joint venture by which they would combine TAI's resources with Autocats'/Vollero's experience and knowledge of the catalytic converter recycling industry to form a new converter collection company to be known as ELV Components Recycling, Inc. ("ELV"). Negotiations proceeded intermittently for a few years before a deal was ultimately structured.

At a July 8, 2010 Board of Directors' meeting of TAI, Mr. Saada and other TAI executives made a presentation which was approved by TAI's Board establishing a joint venture between the interests of TAI on one side and Vollero on the other side. It was contemplated that on the closing of the transaction, ELV would be owned 80% by TAI and 20% by Vollero. ELV would be capitalized for a total of $2 million which would require TAI to invest $1.6 million and Vollero to invest

$400,000. ELV was formed in December of 2010, but remained dormant until the transaction closed. Vollero's $400,000 investment funds would come from the funds he was to receive from ELV's purchase of Autocats' assets pursuant to an Assets Purchase Agreement. Ultimately, a deal for the joint venture was reached in 2011 and culminated in : (1) An Assets Purchase Agreement entered into dated May 16, 2011, by and between Autocats, Inc. ("Seller"); ELV Components Recycling, Inc. ("Buyer") and Scott Vollero ("Scott") (Exhibit 1127); (2) A Shareholders' Agreement entered into dated May 16, 2011, by and between ELV Components Recycling, Inc. ("Company"); Toyota Tshusho America, Inc. ("TAI"); and Scott Vollero ("Vollero") (Exhibit 1184); (3) Escrow Agreement entered into dated May 16, 2011, by and between Autocats, Inc. ("Seller"); ELV Components Recycling, Inc. ("Buyer"); and JP Morgan Chase Bank National Association ("Escrow Agent") (Exhibit 32); (4) Employment Agreement under date of May 16, 2011, by and between ELV Components Recycling, Inc. ("Company") and Scott Vollero ("Vollero") (Exhibit 119); and (5) Non-Competition Agreement under date of May 16, 2011, by and between Autocats, Inc. ("Seller"), ELV Competition Recycling, Inc. ("Buyer") and Scott Vollero ("Vollero") (Exhibit 1098). These are the documents and exhibits that serve as the basis for the present arbitration under the Shareholders' Agreement.

Pursuant to the Assets Purchase Agreement, TAI acquired by and through the ELV subsidiary corporation that had been formed in December of 2010, certain scheduled assets of Autocats and paid Vollero, as sole shareholder of Autocats, the sum of $4.4 million. $400,000 of the funds received by Vollero were used to purchase a 20% interest in ELV. TAI contemporaneously loaned ELV the funds with which ELV used to purchase the said assets from Autocats.

Prior to the closing of the joint venture transaction, TAI valued Autocats' hard assets at approximately $400,000 with the remainder being allocated to goodwill. TAI referenced this goodwill as Mr. Vollero's expertise, knowledge and reputation in the catalytic converter recycling

industry. TAI executives defined the term "goodwill" as the value of a business over its hard assets. In this case, TAI was of the opinion that $4 million of the $4.4 million that ELV used to purchase certain assets of Autocats was for goodwill as the principal asset ELV purchased was Vollero himself. It was on this basis that TAI loaned ELV the funds ELV used to fund the Assets Purchase Agreement.

The evidence presented at the Arbitration Hearing is clear and convincing. At no time prior to the May 16, 2011 closing did Vollero disclose the fraudulent counterfeiting activities that he and Autocats had undertaken. It is also clear and convincing that none of the TAI executives or personnel were aware of the fraudulent activities of Vollero or Autocats prior to the closing. In fact, TAI executives and personnel testified that the joint venture transaction would never have been consummated had the true facts been known.

What is of particular importance to the undersigned are the numerous misrepresentations and warranties contained in the closing documents made by the seller and parties associated with the seller. Specifically, section 16.22 of the Assets Purchase Agreement executed by Autocats, Inc. and Scott Vollero, in his individual capacity, states in part as follows:

> "16.22 Compliance with Law and Other Instruments. The AC (Autocats) Business has been and is now being conducted in compliance with all applicable statues, laws, ordinances, reporting and licensing requirements, rules and regulations of all Government Authorities except where a failure to comply would not have a material adverse effect on the AC Business…"

Nothing could be clearer. Vollero failed to disclose his and Autocats' fraudulent business activities and when disclosures were made they were materially false. Some may view acts of

37

omission, the absence of an act, as far less intrusive or harmful than acts of commission, the committing of an act, even if the outcomes are the same or worse. In the present case, Mr. Vollero committed acts, material/misleading omissions, by failing to disclose; and acts of commission by making false representations and warranties. The undersigned finds that TAI would never had provided ELV the funding necessary to complete the ELV/Autocats acquisition, much less entered into the joint venture transaction with Mr. Vollero had the true facts been disclosed or known. As such, TAI would be entitled to recover damages from Vollero for the failure to disclose the counterfeiting activities of Vollero and Autocats prior to May 16, 2011. See *Weiner v. Fleischman*, 54 Cal. 3d 476 (1991), joint ventures are fiduciaries with a duty of full disclosure. See also, California Civil Code Section 3343(a).

I respectfully dissent as to Claim 3.

## SCOTT VOLLERO'S COUNTERCLAIMS

## I

## COUNTERCLAIMS 1 AND 4 – BREACH OF FIDUCIARY DUTY, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The undersigned hereby concurs with the result reached by the majority as to Vollero's Counterclaims 1 and 4. However, the undersigned is of the firm opinion that California's business judgment rule prevails and is a bar to any recovery being sought. The evidence clearly established that management's decisions which were made by the directors and officers of both ELV and TAI were made in good faith in what they believed were in ELV's best interest. In fact, Scott Vollero as Executive Vice President, played a significant role in formulating and implementing many of the business decisions he now complains of.

38

California's business judgment rule sets forth "a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions" and is "based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes." *Berg & Berg Enterprises LLC v. Boyle*, 178 Cal. App. 4th 1020 (2009).

## II

## COUNTERCLAIM 2 – DECLARATORY RELIEF

The undersigned respectfully dissents with the result reached by the majority with reference to Vollero's Counterclaim 2. TAI suffered damages directly attributed to Vollero's fraudulent activities. Pursuant to California Civil Code Section 3343(a) TAI should be allowed to recover as damages those funds TAI loaned to ELV to enable ELV to purchase certain assets of Autocats.

## III

## COUNTER CLAIM 3 – BREACH OF CONTRACT

The undersigned hereby concurs with the result reached by the majority as to Vollero's Counterclaim 3 and finds that California's business judgment rule is controlling.

## IV

## COUNTERCLAIM 5 – EQUITABLE INDENITY

39

The undersigned respectfully dissents with the reasoning reached by the majority with reference to Vollero's Counterclaim 5. TAI suffered damages directly attributable to Vollero's fraudulent activities that should be compensated. Specifically, TAI should be allowed to recover as damages those funds loaned by TAI to ELV that enabled ELV to purchase certain assets of Autocats.

V

**COUNTERCLAIM 8 – DECLARATORY RELIEF**

The undersigned respectfully dissents with the result reached by the majority with reference to Counterclaim 8. Exhibit 32 is an Escrow Agreement entered into dated May 16, 2011. Pursuant to that Escrow Agreement, there remains on deposit funds that are to be released when certain contingencies set forth in the Assets Purchase Agreement (Exhibit 1127) have been met. Vollero is seeking to have those funds released to him. The majority of the Panel agrees with Vollero's position, "as it appears to be merited by earlier parts of the Award." The undersigned disagrees as it serves to compensate Vollero for his misdeeds. These funds, should, in the opinion of the undersigned, be returned to ELV as partial recovery.

More importantly, the undersigned dissents with the result reached by the majority in reference to Counterclaim 8 in that the majority exceeded their authority to grant the relief requested by Vollero. Specifically, this specific arbitration, (50-20-1300-1142), between TAI and Vollero, is contained in the Shareholders' Agreement dated May 16, 2011. The arbitration was ordered on November 7, 2013, pursuant to the Federal Arbitration Act ("FAA"), by the United States District Court for the Central District of California Case No. SACV 13-1077AG ("Order").

A separate and related matter, ICDR Case No. 72-20-1300-1067, between ELV and Vollero, et al., is subject to a separate and distinct arbitration clause contained in the Assets Purchase Agreement also dated May 16, 2011 between those specific parties.

In Paragraph I C, the majority recognized the difference by stating: "While the instant case (50-20-1300-1142) and that case, in which Hon. Eric E. Younger is the sole Arbitrator (72-20-1300-1067), have been consolidated for certain purposes, including discovery and some briefing and testimony, the latter case (72-20-1300-1067) will be resolved after the completion of this matter (50-20-1300-1142)."

It is apparent from the result that the majority has morphed the two separate arbitrations in order to grant Vollero the relief requested in Counterclaim 8, which the undersigned respectfully contends exceeds the jurisdiction of the Award.

Vollero's relief, in the opinion of the undersigned, is more appropriately the subject matter of case No. 72-20-1300-1067 brought pursuant to the Assets Purchase Agreement, not the Shareholders' Agreement.


## VI

## COSTS AND ATTORNEYS' FEES

The undersigned concurs and finds there is no prevailing party and, accordingly, awards no costs or attorneys' fees to either party as set forth in the majority opinion dealing with this issue.


Date: July 29, 2015

08-04-2015

Hon. Dickran Tevrizian (Ret.)
Chair – Neutral Arbitration

41